UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CODY DUNN, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL J. ASTRUE, Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | No. 4:08-CV-1723 (CEJ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On June 13, 2006, plaintiff Cody N. Dunn protectively filed an application for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of November 29, 1986. (Tr. 11, 87-92). After plaintiff's application was denied on initial consideration (Tr. 37-41), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 42).

The hearing was held on March 20, 2008. Plaintiff was represented by counsel. (Tr. 18-32). The ALJ issued a decision on March 26, 2008, denying plaintiff's claims. (Tr. 8-17). The Appeals Council denied plaintiff's request for review on September 3, 2008. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The ALJ received testimony from the plaintiff, who was 21 years old at the time of the hearing. He graduated from high school in May 2006. (Tr. 22). He resides with his father in Sullivan, Missouri. (Tr. 22, 25).

Plaintiff testified that he works at a sheltered workshop doing tasks such as packaging and labeling; he works five days a week and earns approximately $150 every two weeks, based on his productivity. (Tr. 24). He had been assigned to work at a rest area but was removed after one day because there were concerns about "people messing with" him; he also did not attend properly to his assigned tasks. (Tr. 24-25). During his sophomore year of high school, plaintiff worked as a dishwasher; he was fired after two or three weeks because he worked too slowly. His only other employment had been as a fry cook. He quit that job after two and a half months, after he was hit by a car. (Tr. 23, 27).[1]

At school, plaintiff received mathematics instruction in a self-contained class room. He received support for his other subjects in a resource room. Although he did "pretty good" in English and writing, he did not do well in math. (Tr. 27). He took information technology classes for two years during high school but his grades did not qualify him to take the examination for an IT certificate. (Tr. 26).

Plaintiff testified that his father does the cooking for household. (Tr. 25). Plaintiff washes the dishes, vacuums and straightens up. He failed the driver's license test twice and does not drive. (Tr. 26). When asked about his social life, plaintiff testified that he spends time with a friend from high school and goes to a karate class. He also attends church. (Tr. 27).

---

[1]This accident occurred on August 13, 2003; plaintiff did not sustain major injuries. See Tr. 227-33. He participated in physical therapy to address moderate back pain. Tr. 225-26.

Jeffrey F. Magrowski, Ph.D., a Vocational Expert (VE), provided testimony regarding the employment opportunities for a hypothetical individual of the age, education, and work experience[2] of the plaintiff who has the ability to understand, remember and follow simple instructions, and to perform simple repetitive tasks in a routine work setting, with occasional contact with the public and coworkers. (Tr. 30). Dr. Magrowski opined that such an individual could perform work available in the economy at the light, medium, and heavy exertional levels; *e.g.*, cook helper, stock clerk, packer, and laborer. (Tr. 30-31).

The record includes an undated Disability Report completed by plaintiff. (Tr. 100-08). Plaintiff listed his disabling condition as attention deficit hyperactivity disorder, which affected his ability to pay attention and listen; his father stated that it "seem[ed] nearly impossible" for plaintiff to follow instructions. (Tr. 101). Plaintiff indicated that his longest-held job was as a "cook/dishwasher." (Tr. 102). He "was fired for being too slow." (Tr. 101). Plaintiff received treatment for ADHD and depression from John Crane, M.D.; he was hospitalized in a "stress unit" for one or two weeks during seventh grade. (Tr. 104). The interviewer noted that plaintiff's speech seemed more appropriate for a much younger person and that he never made eye contact with her. (Tr. 112).

Plaintiff's father, Kenneth Dunn, and sister, Kelly Dunn, completed Function Reports. (Tr. 114-23; 124-32; 145-53). Plaintiff and his father take care of the family's animals. Mr. Dunn indicated that plaintiff's self-grooming had been poor but was improving. (Tr. 115-16). Plaintiff is able to prepare simple foods such as sandwiches but is unable to follow written directions for more complex meals. Plaintiff's household chores include doing the laundry, vacuuming and mowing the

---

[2]Dr. Magrowski stated that plaintiff did not have any past relevant work.

grass. He watches television and uses the computer. (Tr. 116). Plaintiff cannot drive or ride a bicycle, and he has a very poor sense of direction; if he were to become lost, he would be unable to follow verbal directions to find his way home. (Tr. 117). Mr. Dunn identified the following abilities affected by plaintiff's condition: understanding, following instructions, talking, hearing, completing tasks, concentrating, getting along with others, using hands, and memory. He cannot finish what he starts and he does not get along "at all" with the police. (Tr. 119). Plaintiff has difficulties getting along with others because he does not understand what is proper. Id. He does not handle stress or changes in routine well. (Tr. 121). He is afraid of insects, birds, and snakes, but trusts dogs indiscriminately. Id. In a narrative portion, Mr. Dunn indicated that his son can become extremely emotional, boisterous, and irritable when he loses things or encounters difficulties expressing himself. (Tr. 122). Kelly Dunn stated that plaintiff does not shop on his own because he cannot handle money. (Tr. 127). She identified his poor impulse control as a disabling factor. (Tr. 129).

### III. Educational Records

Plaintiff was evaluated for special education services at the age of four. It was determined at that time that he met the criteria for admission to the Early Childhood special education program in the areas of cognitive/adaptive, speech, receptive language and expressive language. (Tr. 157). Upon re-evaluation in kindergarten, plaintiff's primary diagnosis was language disordered with a secondary diagnosis of learning disabled. In second grade, he was diagnosed as learning disabled in math calculation and written expression. Id.

A three-year evaluation was completed in 1998 when plaintiff was in fifth grade. (Tr. 197-99). It was determined that new testing was not necessary. (Tr. 197). Plaintiff was described as having poor peer relationships and lacking in age-appropriate

social skills; he kept to himself. His adaptive behavior was age-appropriate. Although he scored below age level on tests of his cognitive abilities, plaintiff's teacher believed that he was functioning at a higher level than he had in the past. He was assessed as functioning in the low-average/borderline range. (Tr. 198).

The record contains a copy of the Individualized Education Program (IEP) developed in the fall of 2004 when plaintiff was in the eleventh grade. (Tr. 184-96). Plaintiff's strengths were in reading and reading comprehension; his weaknesses were in math calculation, written expression, organization and task completion. Additional services for speech and language had ceased two years earlier -- plaintiff nonetheless maintained passing grades in his core classes. Plaintiff was enrolled in the Information Technology class at a career center, where he was described as working hard, socializing well, but earning low grades because he missed assignments. It was noted that organization "is a concern"; he had previously used a planner with success. (Tr. 185).[3]

An IEP was prepared at the start of plaintiff's senior year in 2005. (Tr. 161-83). It was noted that plaintiff's general health was normal; he had no deficits in his motor skills or hearing and his visual acuity was functional. (Tr. 182). His overall adaptive behavior was described as age appropriate and commensurate with his cognitive functioning. With respect to academic ability, plaintiff's reading skills were in the average range, his writing skills were below average, and his math calculation skills were "a significant concern." A review of the social, behavioral, and emotional domains presented no significant concerns and plaintiff's transition skills were assessed as age appropriate. Id. During an observation of plaintiff in his class room, it was

---

[3]Subsequent records state that plaintiff failed the first-year IT program at the career center. He repeated the program during his senior year and earned a grade of "D." (Tr. 204).

noted that plaintiff was able to focus on the goal at hand and follow the progression of the class, despite the lack of an agenda and "the obnoxious behavior" of those around him. He was on-task during a vocabulary test and he responded during class discussion with correct and appropriate responses. He made smooth transitions and was able to regulate his behavior. (Tr. 181).

In January 2006, it was determined that plaintiff still met the criteria for a learning disability in math calculation but no longer qualified for a learning disability in written expression. (Tr. 158). The Wechsler Adult Intelligence Scale - Third Edition (WAIS - III) was administered on December 15, 2006. (Tr. 176). Plaintiff received a verbal IQ score of 102, a performance IQ score of 76, and a full scale IQ score of 90, placing him in the average range of intelligence. His scores on the subtests indicated a relative strength in vocabulary. It was noted that when tested in the second grade plaintiff had scored in the intellectually deficient range. (Tr. 162). No explanation for the difference in the IQ scores appears in the record.

Between April 7, 2006, and June 29, 2006, plaintiff participated in a Comprehensive Transition Assessment conducted by Choices for People. (Tr. 207-19). At that time, plaintiff lived with his father and older sister. His father had applied to the Social Security Administration for disability benefits for himself.[4] Plaintiff did not have a driver's license and was dependent on family members for transportation. Plaintiff's hobbies include "anything to do with computers." (Tr. 203). In high school, plaintiff participated in drama and served as a mentor in the computer lab. He had

---

[4]The record contains a letter written by the family pastor in support of the family's request for financial assistance. The author describes plaintiff and his father as "really very intelligent but severely handicapped when it comes to relating to people (i.e. peers in the work force), remembering and following instructions (i.e. short term memory) and at times can be easily distracted by . . . non-important details. . . In my personal opinion, both Kenny and Cody suffer from some form of autism." (Tr. 221).

very limited competitive employment experience, consisting solely of brief jobs at two restaurants. He also mowed lawns. Id.

In the course of the assessment, plaintiff shadowed a systems information technician at a medical center (Tr. 211-12), completed data entry and document shredding at Rolla City Hall (Tr. 213), assisted at a food pantry (214), worked as a kitchen aide at a nutrition site (Tr. 215), and did housekeeping at a veterans' home (Tr. 216). In an assessment of his learning style, plaintiff was described as responding well to hands-on modeling and repetitive demonstration. Written checklists and reminders were recommended. (Tr. 207). Plaintiff's physical strength was assessed as average. (Tr. 207). His endurance was of concern – he fell fast asleep when being driven to and from work sites and complained of fatigue. (Tr. 207-08). He also took frequent unscheduled bathroom breaks. Plaintiff exhibited great difficulty staying on task and required constant redirection, even with repetitive tasks. He was frequently distracted by events in his surroundings and made frequent errors. He was not able to multi-task and it was thought he would do best with simple one- or two-step commands because he works at his own pace. (Tr. 208).

Plaintiff was described as well-mannered, polite, and able to exhibit a good sense of humor when comfortable in his environment. He maintained his demeanor and handled stress appropriately. One area of concern was his frequent references to his depression. Id. His expressive skills were adequate; his receptive skills were less so. He required frequent repetition of instructions. (Tr. 209). Plaintiff was described as a little immature and requiring more assistance in improving his social skills. Nonetheless, he was very personable. (Tr. 210). Plaintiff assessed his participation in the evaluation as "very constructive" and reassuring; he stated that he could not wait to start work at Meramec Sheltered Industries. (Tr. 219).

## IV. Medical Records

The record contains very limited medical evidence related to plaintiff's alleged disabilities. Plaintiff receives treatment for his ADHD and depression from psychiatrist John Crane, M.D., at the Family Wellness Program.[5] Plaintiff was seen by Dr. Crane on February 24, 2004. His mental status was described as "unremarkable – not 'floaty.'" It was noted that he was tolerating his medications, which are not identified. On August 3, 2004, plaintiff reported that he had lost his dishwashing job because he was too slow. His mental status was unchanged. Id. On November 2, 2004, plaintiff expressed enthusiasm for computers; his grades were poor but he hoped to improve them. He kept losing his textbooks. Dr. Crane opined that plaintiff was "a bit more interactive" with him. (Tr. 244). On March 8, 2005, plaintiff was "stressed out," mostly about school matters. Id. On May 24, 2005, plaintiff complained of being unable to focus and losing things. Dr. Crane increased the dosage of plaintiff's prescription for Adderall. (Tr. 245). On August 16, 2005, plaintiff reported that he was considering applying to college to study computers. He had been out of Welbutrin for two weeks. Dr. Crane observed no change in plaintiff's mental status. Id.

On October 4, 2005, plaintiff's father called to say that plaintiff was doing better on a new prescription for Lamictal. Dr. Crane noted that he was considering decreasing the Adderal and adding a mood stabilizer. (Tr. 246). However, at an office visit on December 27, 2005, plaintiff's father reported that the medication decrease had "a very adverse effect" on plaintiff's concentration and focus. Dr. Crane noted that plaintiff's father was "as disorganized as ever." Plaintiff's mental status seemed "more appropriate – not so 'spacey.'" Dr. Crane added a prescription of Depakote and

---

[5]The records available to the Court begin on December 22, 2003, with a note that states "Staff notes sent to Disability." (Tr. 243).

continued the Adderall. Id. On April 25, 2006, plaintiff had questions regarding his medications, which confused Dr. Crane until plaintiff stated that he was taking his Adderall three times a day rather than twice because "I don't wanna be like my dad – look how he turned out." Plaintiff's mental status was unchanged. Dr. Crane increased plaintiff's Adderall. (Tr. 247).

A Psychiatric Review Technique form was completed on August 22, 2006. (Tr. 248-61). The reviewer indicated that plaintiff has an organic mental disorder – attention deficit hyperactivity disorder and a learning disability disorder; and an affective disorder – depression. The reviewer determined that plaintiff had mild limitations on performing the activities of daily living and maintaining social functioning, and moderate limitations on maintaining concentration, persistence or pace. The reviewer noted there were no repeated episodes of decompensation of extended duration. In the narrative portion, the reviewer noted that plaintiff was diagnosed with attention deficit hyperactivity disorder, depression, and a learning disability. (Tr. 258). School records indicated that plaintiff's adaptive behavior was age appropriate and that he had no significant social, emotional, or behavioral problems. He got along well with others. He is distractible and has difficulty following directions and remaining on task.

## IV. The ALJ's Decision

In the decision issued on March 26, 2008, the ALJ made the following findings:

1. Plaintiff had not engaged in substantial gainful activity since the alleged onset date.

2. Plaintiff has an attention deficit hyperactivity disorder, a learning disability in math calculation, and a depressed mood. These impairments are severe in combination.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. Plaintiff has not alleged or exhibited any exertional limitations and has no physical impairments. Plaintiff's mental impairments limit him to performing work involving simple instructions and directions, within a routine work setting and with only occasional contact with the public. Plaintiff has no other nonexertional impairments.

5. Plaintiff has no past relevant work.

6. Plaintiff is a younger individual.

7. Plaintiff has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because plaintiff has no past relevant work.

9. Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that plaintiff can perform.

10. Plaintiff has not been disabled within the meaning of the Social Security Act since June 13, 2006, the date the application was filed.

(Tr. 12-17).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145,

1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B. Analysis

Plaintiff contends that the ALJ erred in determining that he does not meet the requirements of Listing 112.02 -- Organic Mental Disorders, found in the childhood category of impairments. Defendant notes that plaintiff's claim must be evaluated under Listing 12.02, the adult listing for Organic Mental Disorders, because plaintiff was already eighteen years old when he applied for benefits. See 20 C.F.R. §

416.920(a)(2) (rules regarding evaluation of disability in adults "apply to you if you are age 18 or older and you file an application for Supplemental Security Income disability benefits."). Plaintiff's arguments regarding Listing 112.02 will be considered under Listing 12.02.

Listing 12.02 may be satisfied either by meeting one Category A plus two Category B criteria, or by meeting one Category C criterion. 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.02. Plaintiff argues that he meets the "A plus B" formulation. Defendant asserts that plaintiff cannot satisfy Category B; the Court will assume that plaintiff satisfies Category A. Defendant's arguments directed to Category C will not be addressed as plaintiff makes no claim to satisfy that formulation.

To satisfy Category B, plaintiff must demonstrate two of the following four conditions:

1. Marked[6] restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Id. Plaintiff contends, without citation to the record or explanation, that he satisfies the second and third conditions of Category B.

The ALJ relied on the findings of the state agency medical consultant as recorded in the Psychiatric Review Technique to determine that plaintiff did not satisfy the criteria of Category B. (Tr. 15-16). The ALJ properly treated these findings as expert opinion evidence of a nonexamining source, 20 C.F.R. § 416.927(f)(1), and

---

[6]A "marked" limitation is more severe than a "moderate" limitation, but less severe than an "extreme" limitation. Id. at § 12.00C.

determined that the findings were consistent with the substantial evidence of the record.

The agency reviewer determined that plaintiff had mild limitations in the ability to maintain social functioning. (Tr. 256). These findings are consistent with other evidence in the record: School records indicate that plaintiff's social functioning improved as he aged. For example, in eleventh grade, he was described as "socializing well" at the career center and, during his twelfth grade IEP, no concerns were noted with regard to the social domain. In his classroom, plaintiff was observed to interact freely with classmates, despite their "obnoxious" behavior. And, at the conclusion of his lengthy transition assessment, plaintiff was described as well-mannered, polite, able to exhibit a good sense of humor, maintain his demeanor, and handle stress appropriately. Thus, assuming without deciding that plaintiff can establish that he has marked limitations in his ability to maintain concentration, persistence or pace, he does not satisfy a second Category B criterion. Plaintiff has failed to establish that the ALJ erred in determining that he does not meet Listing 12.02.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #16] is **denied**.

All other pending motions are denied as moot.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of February, 2010.